UNITED STATES, Appellee,

v.

Anthony R. MACK, Staff Sergeant,
U.S. Air Force, Appellant.

No. 65,864.
ACM 28493.

U.S. Court of Military Appeals.

Argued May 8, 1991.

Decided Sept. 20, 1991.

---

For Appellant: *Captain Ronald A. Gregory* (argued); *Lieutenant Colonel Jeffrey R. Owens* (on brief).

For Appellee: *Major Paul H. Blackwell* (argued); *Lieutenant Colonel Brenda J. Hollis* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

In November 1989, appellant was tried by a general court-martial composed of officer members at Soesterberg Air Base, The Netherlands. Contrary to his pleas, he was found guilty of wrongfully using cocaine on or about July 6, 1989, in or near The Netherlands, in violation of Article 112a, Uniform Code of Military Justice, 10 USC 912a. He was sentenced to a bad-conduct discharge, forfeiture of $500.00 pay per month for 1 month, and reduction to pay grade E–1. The convening authority approved, and the Court of Military Review affirmed, these results in an unpublished opinion dated November 20, 1990.

We granted review on the following issue:

WHETHER THE FAILURE TO COMPLY WITH AIR FORCE PROCEDURES CONCERNING THE SECURITY OF APPELLANT'S URINE SPECIMEN AND INCONSISTENT SCIENTIFIC TESTS ON THE SAME URINE SPECIMEN, ONE INDICATING THE PRESENCE OF COCAINE AND THE OTHER NOT SO INDICATING, RENDER THE PROOF INSUFFICIENT TO SUPPORT CONVICTION OF WRONGFUL USE OF COCAINE WHERE THE ONLY PROOF OF SUCH USE WAS THE URINALYSIS TEST OF THAT SPECIMEN.

We hold as a matter of law that this record of trial with its conflicting government evidence was not legally sufficient to support appellant's conviction for wrongful cocaine use. *United States v. Harville*, 14 MJ 270 (CMA 1982).

The court below said the following concerning the granted issue:

During a unit inspection, the appellant provided a urine specimen. The chain of custody was maintained, proper laboratory procedures were followed, and the specimen tested positive for the cocaine metabolite benzoylecgonine (BE). The presence of BE in a person's urine indicates either that cocaine was ingested

into the body or that it was somehow placed in the specimen after it was provided (i.e., BE can be produced *in vitro*).

A portion of the urine specimen was subsequently analyzed, by another laboratory, and tested negatively for the presence of the cocaine metabolite ecgoninemethylester (EME). A urine specimen will test positive for EME only if cocaine is actually consumed; EME is a "true metabolite" which can only be produced in the human body.

The appellant attacks his conviction because of the apparent discrepancy between the drug tests. However, even assuming proper analysis by both laboratories, an important distinction exists in the length of time the two metabolites stay in the body. At trial, testimony established that the half-life of EME is about one hour less than that of BE. In other words, there is a one hour difference in the time it takes the body to eliminate one-half of EME as compared with BE. Thus, the negative test for EME can simply mean that it had dissipated because of its shorter half-life, while BE remained at a sufficient strength to be tested.

The issue of whether cocaine had been knowingly ingested was well framed at trial, and the members were properly instructed on how to consider the urinalysis evidence. *United States v. Mance*, 26 MJ 244 (CMA 1988). We are satisfied that the appellant's wrongful use of cocaine was proven beyond a reasonable doubt. Article 66(c), UCMJ; *United States v. Turner*, 25 MJ 324 (CMA 1987).

Unpub. op. at 1–2.

Major Kippenberger, the Government's expert on urinalysis testing and procedure and the chief of technical services at Wiesbaden Forensic Toxicology Drug Testing Laboratory, testified, *inter alia,* as follows on direct examination:

Q. You described the RIA test and the GC/MS test. Were any other tests performed on this particular sample?

A. Yes. At your request, we requested that the Fort Meade lab run what is called an ecgoninemethylester test.

Q. And what is that?

A. Ecgoninemethylester is another metabolite. In fact it is a true metabolite of cocaine, in that it is produced only in the body. Benzoylecgonine, as a break-off, can be formed in urine or in anything that has a pH greater than six, and therefore, you can take cocaine and dump it into a urine and get benzoylecgonine formed, where EME or ecgoninemethylester, you can only get it with cocaine ingestion or somehow taking it into the body. It's a metabolism product.

Q. And you did perform that test on this particular sample?

A. We didn't; the Fort Meade lab did.

Q. Are you familiar with the results of that test?

A. Yes, it was found to be negative.

Q. And what does that mean?

A. It means one of two things. The first is, ecgoninemethylester does not last that long in the body compared to benzoylecgonine. So, if you have the curves, you would expect ecgoninemethylester to disappear where benzoylecgonine would still be around in the urine. So it could be that the ecgoninemethylester is gone, but the benzoylecgonine could possibly be above 150 nanograms or what we would call positive, because its elimination rate is quicker than for benzoylecgonine.

The second possibility is that someone took cocaine and put it into the urine.

Q. Are you able to give a proximation of the relative time frames that you might see those two different metabolites in the urine specimen?

A. It depends on how much the person took. The elimination half-lives in the literature are about an hour difference. So how long it would stay in the body, you know, there's about an hour difference. And then, of course, that accumulates over time.

The half-life is how long it takes for your body to eliminate one-half of what you have.

Q. Did you also test the pH in this particular substance?

A. Yes, we did.

Q. And what was the result of that test?

A. The pH of the urine, as reported to me, was pH9.

Q. And what does that mean?

A. A pH9, if you took cocaine, and put it into urine, it would hydrolize to benzoylecgonine fairly easily.

ATC. Just a moment, please, Your Honor. (Both government counsel conferred)

Q. Dr. Kippenberger, has any DOD laboratory been certified to perform the test you mentioned, the EME testing?

A. No, it has not.

On redirect examination he testified:

Q. Dr. Kippenberger, why is it that the DOD is determined that the BE test is the test that they ought to perform to determine whether or not a sample is positive for cocaine?

A. Because it's a major metabolite and lasts longer than any other metabolite.

Q. *And in your opinion, does the absence of EME necessarily mean that a person hasn't used cocaine?*

A. *We cannot eliminate that, no.*

Q. Would you explain that, please.

A. In other words, just because EME is not there does not mean that the person did not ingest cocaine. It just means that they took it at a longer time out, because EME is eliminated quicker; the benzoylecgonine will still be positive or above our cut, where the EME would be gone, because EME is eliminated faster than benzoylecgonine is.

Q. For example, is it possible that the EME would have been eliminated in forty-eight hours, whereas BE could still be picked up in a sample after that?

DC. Your Honor. I object to that as being a leading question. This is direct examination.

MJ. Overruled.

A. *Again, I'm a little fuzzy, because I don't have the articles with me that deal with that.* It does state uncategorically that that would be—It depends on how much the person took and when they took it on the forty-eight, seventy-two-hour position. But it is very possible that someone could take cocaine and then, over a period of time, the ecgoninemethylester is eliminated and the benzoylecgonine is still present as a positive rate, at a positive value. I cannot rule that possibility out.

Q. Would another reasonable alternative for the presence of BE or the lack of EME be that someone has sabotaged the sample?

A. Yes.

(Emphasis added.) Court members later questioned this government witness:

Questions by Captain Baugh:

Q. I also have a question on the half-life of the EME.

A. Uhum.

Q. Earlier you said it's about an hour different. Does that mean the half-life is an hour different—

A. Right.

Q. —which means if you—I'm kind of confused about it. If you took it—The half-life of BE is twenty hours. That means the half-life of EME is ten hours?

A. Right. I think that the exact values are around four hours for EME and around five to eight hours for benzoylecgonine. It depends on—And I'm sure the EME is different, too.

It depends on what article you look at. There's one article which the people did both metabolites at once. The benzoylecgonine was around five hours and the ecgoninemethylester was around four. I can give you the exact numbers if you want them. I'd have

to look them up in my bag. It might take me a little bit to find them.

Q. Is there anything that would increase one to eliminate out of the body quicker than the other, anything you could do or take or drink or eat that would make one go quicker than the other?

A. I don't think they would eliminate at different speeds. They obviously do, but, I mean, I don't know if there's anything that you could force one over the other. I'm not aware of it.

MBR. Thank you.

MJ: Captain Fox?

Questions by Captain Fox:

Q. Doctor, would the EME test be valid? It appears it was done four months and some days after the specimen was taken. Would it still be valid after four months?

A. To our knowledge, ecgoninemethylester, or to my knowledge, ecgoninemethylester, if it was there, would still be there. *Unfortunately, we got the result this morning over the phone. I did not have an opportunity to talk to the people that did the test to ask them more pointed questions, why, you know—* They told me, when I first asked for the test, how high was the cocaine, the benzoylecgonine result, and I told them it was around 1000 nanograms. And they said, "Well, then we have a chance of seeing it." So there might be a lot more things about the EME test that, like, if it was 300 nanograms, we could have limited detection. One of the detections for cocaine or benzoylecgonine is 25 nanograms. The limit of detection for ecgoninemethylester by their standards might be 250 nanograms. So they would not be able to call it positive, if it was above that, you know, unless it was below that result, even though it might be there, because of their own standards. *I did not have that opportunity to find out the standards that they ran that test under, because they are the only lab that I know in the DOD that would even run it. So that would be a problem.*

\*　　\*　　\*　　\*　　\*　　\*

Questions by Captain Moshian:

\*　　\*　　\*　　\*　　\*　　\*

Q. So is it possible to calculate how much cocaine had to have been ingested for it to reach the DOD thing?

A. No. This curve was in the body. This curve is not in vitro. I[t] isn't sitting in the tube or in the bottle back in the lab now or anything like that. This is your body. We're taking urine from you after you've ingested the cocaine and figuring out, well, gee, you know, we know you took this amount and this is what you're reading now.

Q. So as soon as you put it in a bottle, does it stop aging or—?

A. *I can tell you—I need to ask a question. Am I allowed to say what the concentrations of the BE was at Fort Meade for him? Is that—*

DC. Well, we've got to have a 39(a), because we don't know.

MJ. Do you need to say that to answer the question?

A. Okay. The benzoylecgonine does not stay at a stable level in the bottle. In other words, if you run it now, if we take the specimen today and run it, and then we run the specimen two months from now, the chances of them being—If they're the value, it wouldn't mean anything to me. If it decreased, it wouldn't mean anything to me. I mean, in general, the drugs decrease over time. I think that I can say for sure. We see a concentration drop over time.

Q. Is there a reason why you freeze it in between tests? Is that to keep it from decreasing?

A. We freeze it at the end when we're done, and that does slow down the deterioration process as you might suspect.

MJ: Okay, if there are no others by the members, let me ask you one, doctor.

Questions by the military judge:

Q. As I understand what you said, it would be possible, once a sample is collected, in vitro, for the benzoylecgonine to go up, not to deteriorate, but the concentration to go up if, in fact, there was raw cocaine in the urine that was hydrolized.

A. Yes, sir. That would be normally true if the pH was lower. At the pH that this specimen was run at, a pH of nine is what it is right now, and that means it was probably a little lower—the pH rises over time—that I would suspect that all the benzoylecgonine, by the time we got the sample and it sat around those ten or twelve or fourteen days, that it probably, if there was cocaine in the urine, it all got hydrolized to cocaine.

So, if I did, you know—If the results of the Fort Meade result came in, it does not mean that someone doctored the sample. I could not eliminate that.

Q. Okay, and I gathered from your testimony that you had no question that there was benzoylecgonine in that sample.

A. Yes, sir.

Q. And there are two possible sources: One, through hydrolysis in the body of the person providing the sample.

A. Yes, sir.

Q. Or two, somebody dumping raw cocaine into the sample.

A. That's right. I cannot eliminate those.

Q. Those are the only two theories that you're aware of.

A. Yes, sir.

MJ. Okay, do counsel for either side have further questions?

(Emphasis added.)

---

Appellant pleaded not guilty in this case. He also took the witness stand and denied ever using cocaine or any other illegal drug. He vigorously maintained his innocence despite the positive drug tests which he simply could not explain. Finally, he introduced considerable military character evidence to support his denial of this offense. *See generally United States v. Vandelinder*, 20 MJ 41 (CMA 1985). Despite this spirited defense, our concern in the present case is with the legal sufficiency of the Government's proof. *See United States v. Turner*, 25 MJ 324 (CMA 1987). *See generally Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The use of urine drug tests in state and federal criminal prosecutions is not wide-spread.[1] *See* Zeese, *The Use and Abuse of Drug Tests*, 5 Criminal Justice 2, 5 (1991). In any event, it is permitted and can be substantially relied on at courts-martial only where this scientific evidence logically and demonstratively shows drug use. *United States v. Harper*, 22 MJ 157, 161–62 (CMA 1986). Here, the Government's own test evidence was in conflict. There were two government tests: the Wiesbaden test tending to prove that appellant was guilty; the Fort Meade Laboratory test tending to prove appellant was innocent. *See United States v. Harville*, 14 MJ at 271. Moreover, the Government attempted to explain this substantial and absolutely critical discrepancy in terms of general possibilities, not in terms of the particular circumstances of appellant's case.[2] *United States v. Murphy*, 23 MJ 310, 311 (CMA 1987).

---

1. This may be due to the paucity of jurisdictions which punish the actual use of drugs vis-a-vis their possession. *See generally* 28 C.J.S. Drugs and Narcotics Supplement § 150 at 219; G. Uelmen and V. Haddox, *Drug Abuse and the Law Sourcebook* § 6.2 at 6–12.12 (1990).

2. We note that no documentation of the Fort Meade test was presented in this case, and the expert himself admitted his unfamiliarity with the scientific principles and test data necessary to resolve this discrepancy problem. Properly admitted evidence on these matters might have clarified this discrepancy and allowed us to reach a different result.

Accordingly, we hold that such evidence, as presented in this case, created confusion for the triers of fact and, as a whole, did not provide a legally sufficient basis for a rational person to convict appellant of drug use within the meaning of our decisions.. *United States v. Harper, supra. Cf. United States v. Joyner,* 29 MJ 209, 212 (CMA 1989); *see also United States v. Van Horn,* 26 MJ 434, 437 (CMA 1988). *See generally* 9 Wigmore, Evidence § 2494 at 387–88 n.20 (Chadbourn rev.1981).

The decision of the United States Air Force Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The Charge and its specification are dismissed.

Senior Judge EVERETT concurs.

COX, Judge (dissenting):

I recognize that we may well be the only jurisdiction which permits the criminal conviction of a citizen for drug use based solely on a laboratory test of that citizen's urine. *But cf. United States v. Murphy,* 23 MJ 310 (CMA 1987). Therefore, we must be ever vigilant to the truth of the evidence. However, if we are going to have a urinalysis program, we must be prepared to accept simple facts dealing with the chemical properties of drugs.

The simple facts of the matter are:

1. When cocaine is ingested (used) by a human being, it creates metabolites.

2. Two of the metabolites which are created are benzoylecgonine (BE) and ecgoninemethylester (EME).

3. EME dissipates from the human body faster than BE.

4. BE can be produced by mixing cocaine directly into urine if the PH of the urine is greater than 6. EME can only be produced by the body.

Based on these simple facts, I conclude that the presence of EME in a urine sample means that whoever gave it consumed cocaine. If BE is present in the sample, I conclude either that (a) whoever gave the sample consumed cocaine, or (b) the cocaine was added to the sample after it left the body.

In either case, the chain of custody of the sample is the critical issue. The Government must prove beyond a reasonable doubt that the accused provided the sample and that it was unadulterated at the time of the test. If the Government is successful in doing that, it proves that the accused used cocaine.

The absence of EME is not the decisive factor if BE is present in the sample and the chain of custody is established. In other words, if appellant had walked into the laboratory and given a urine sample and the sample tested positive only for BE, proof beyond a reasonable doubt that he used cocaine is established. The lack of EME only means that it has been dissipated from the donor's system. An unadulterated sample delivered to a laboratory has the very same legal result. Thus, in the instant case, my concern is the integrity of the chain of custody and not the lack of EME in the sample. If the sample was unadulterated, the absence of EME means only that the cocaine had dissipated from the system before the time of the test.

From my review of the record, I am satisfied that there is sufficient evidence from which a rational factfinder can conclude beyond a reasonable doubt that appellant used cocaine. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).