**Misc. Nos. 91–05A, 91–05B.**

**UNITED STATES**

**v.**

**Airman First Class Kelvin B. METCALF, FR253–47–5669, United States Air Force.**

**and**

**Airman First Class Tomie C. Mosley, FR322–64–1905, United States Air Force.**

**U.S. Air Force Court of Military Review.**

**28 April 1992.**

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens and Captain Ursula P. Moul.

Appellate Counsel for the United States: Lieutenant Colonel Brenda J. Hollis and Major Paul H. Blackwell, Jr.

Before DIXON, PRATT, and McLAUTHLIN, Appellate Military Judges.

## OPINION OF THE COURT

McLAUTHLIN, Judge:

Was the military judge correct as a matter of law to order further tests of these accuseds' urine samples when the samples were already reported as positive for cocaine metabolites and chain of custody was uncontested? We conclude he was not, and grant the government's appeal.

Airman First Class (A1C) Metcalf and A1C Mosley were each randomly selected to provide urine samples for drug testing. Analysis of A1C Metcalf's sample at the Air Force Drug Testing Laboratory (AFDTL) showed a concentration of 355 ng/ml of the cocaine metabolite benzoylecgonine (BE). A1C Mosley's sample revealed a BE concentration of 223 ng/ml. At the time, the AFDTL's BE cutoff level for reporting samples as positive was 150 ng/ml.[1] Shortly after charges were referred, each accused requested that his sample be tested again for the presence of BE and for the cocaine metabolite ecgoninemethylester (EME). The convening authority denied both requests.

■ These actions were joined in one Article 39(a), UCMJ, pretrial session to evaluate the accuseds' identical motions. In those motions, defense counsel again sought additional tests of the accuseds' samples for BE and EME, and added requests that the samples be tested for the presence of raw cocaine. After hearing the testimony of a defense expert and a government expert, the trial judge granted

---

1. On 1 January 1992, the AFDTL lowered the BE cutoff level to 100 ng/ml for reporting samples as positive.

the defense motions and ordered all the requested tests. When notified of the convening authority's refusal to follow his order, the judge abated the proceedings. The government has now submitted its timely appeal. Article 62, UCMJ, 10 U.S.C. § 862; *see United States v. True*, 28 M.J. 1 (C.M.A.1989).

The defense has not contested either samples' chain of custody. Instead, the defense motions cited the Court of Military Appeals decision in *United States v. Mack*, 33 M.J. 251 (C.M.A.1991),[2] and argued that "a negative EME test could indicate either that the BE test was incorrect or support the reasonable hypothesis that cocaine was added to the sample after it was 'donated.'" At the Article 39(a) session, the defense expert testified that he felt a retest of the samples for BE, EME, and cocaine was "scientifically important." He explained that, while BE and EME were cocaine metabolites produced by the body after ingesting cocaine, BE can also result from mixing raw cocaine into the urine sample itself. According to the defense expert, raw cocaine dissipates in the body after about 10 hours, EME in 40 to 48 hours, and BE in about 72 hours. Therefore, he concluded that a sample containing BE and raw cocaine but no EME could *only* have been "spiked" with cocaine. The defense expert added that, based upon the ratio of EME to BE in the sample, he would be able to give the Court a better indication of how much cocaine was used and when.

Both the experts agreed that BE found in an uncontaminated sample meant the person supplying the sample had used cocaine. In his cross-examination, the government expert said only about 10 grains of raw cocaine sprinkled into a urine sample would be needed to raise the sample's BE level above the AFDTL cutoff levels. He concurred with the.defense ex-

pert's view that the additional tests for EME and cocaine could provide more information regarding the amount of cocaine ingested and narrow the time window in which use took place. The government expert said a negative EME test of these accused's samples would mean either that there had been use but EME was already out of the system, or that the sample had been tampered with. If raw cocaine were found in the sample with no EME, the government expert said he "probably" could render an opinion as to whether the sample had been spiked with cocaine.

Just before receiving counsel's arguments on the motion, the judge commented,

... what I found was most interesting and what seems to be most in favor of the defense request ... is if I ordered the EME test and it proved up negative a recognized expert ... could look at a [raw] cocaine analysis and determine if the sample was spiked. And the significance of that is that even if you have the chain of custody in its present form in the litigation package which shows no breaks in the chain of custody ... if this expert testimony were to be given and if it was believed by the court members, then it would have a significant probability of leading to an acquittal. So it seems to me that it is relevant and if you have a circumstance that could lead to highly exculpatory evidence and weighing that against the relatively small cost.... It seems to me that this is not only relevant information but necessary that could lead to a change in the outcome depending on how the test results come out.

After counsel's arguments on the motion, the military judge announced he would grant the defense request. Among his findings of fact were the following:

By testing for EME and cocaine in conjunction with the BE test, a qualified forensic toxicologist can, with a reason-

---

**2.** In *Mack,* the government had performed both the BE and the EME tests on appellant's urine sample. The BE test was reported positive, but the EME test was reported negative. According to Chief Judge Sullivan, "the Government attempted to explain this substantial and absolutely critical discrepancy in terms of general possi- bilities, not in terms of the particular circumstances of appellant's case." 33 M.J. at 255. Without "[p]roperly admitted evidence" to clarify this contradiction, Chief Judge Sullivan and Senior Judge Everett found no legally sufficient basis for appellant's conviction. Judge Cox dissented.

able degree of certainty, determine whether the cocaine in the urine was ingested by the accused or was placed in the urine from an outside source, either through intentional or unintentional contamination of the sample.

The chain of custody documents are in order in both of the above cases; neither accused can point to a probable break in the chain of custody or to specific evidence supporting intentional or unintentional contamination of their urine samples. The defense in both cases is, essentially, "I never used cocaine, and I don't know how this cocaine metabolite (BE) got in my urine sample."

The judge concluded as a matter of law that the additional tests were relevant and that:

[t]he evidence is "necessary" as defined by the Manual for Courts–Martial because it is not cumulative of other evidence and, if the testing results are as the defense expects them to be, "will contribute to a party's presentation of the case in some positive way on a matter in issue." R.C.M. 703(f)(1). Indeed, this may be the only way that an accused can effectively challenge the government's evidence on chain of custody, since an accused is at somewhat of a disadvantage in demonstrating intentional contamination of his sample or unin-

tentional contamination in the testing process.

 We are bound by the military judge's findings of fact in this appeal unless they are clearly erroneous. *United States v. Burris*, 21 M.J. 140 (C.M.A.1985). Further, in an appeal by the government, we are not permitted to find facts in addition or contrary to the facts found by the military judge. Article 62(b), UCMJ; R.C.M. 908(c)(2). Our review is limited to taking action "only with respect to matters of law." Article 62(b), UCMJ; R.C.M. 908(c)(2).

We find the trial judge's order legally flawed. The judge's use of R.C.M. 703(f)(1) to evaluate these requests was erroneous and led to the wrong result.[3] A reading of the various subsections of R.C.M. 703(f) readily discloses that the focus of that rule is upon a party's right to evidence *already in existence*—not on the right to evidence that is yet to be created.[4] This is an important distinction. It is one thing for the defense to request production of existing evidence, or to seek a delay in order to investigate a possible defense, or to argue to the factfinder(s) that a reasonable doubt exists by virtue of the government's failure to produce additional evidence; it is quite another, however, for the defense to force the government to develop additional evidence or risk abatement of the proceedings.

---

3. Although we do not reach our decision on this basis, we have difficulty with the judge's R.C.M. 703 analysis itself. R.C.M. 703(f)(1) states: "Each party is entitled to the production of evidence which is *relevant* and *necessary*." (Emphasis added.) The discussion following the rule indicates that "[r]elevant evidence is necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way *on a matter in issue*." (Emphasis added.) R.C.M. 703(f)(1) Discussion. According to the military judge, further testing would address the possibility of any "intentional or unintentional contamination" of the samples—some breach in their chain of custody. However, the point can be made that a contaminated chain of custody was never put "in issue" here.

Analogizing to another part of the R.C.M., "[a] matter is 'in issue' when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose." *See* R.C.M. 920(e) Discussion. As

noted in the body of the main opinion, no evidence that these samples might have been tampered with was ever offered here, and the military judge found all chain of custody documentation perfectly "in order." Absent "some evidence," were the accuseds' assertions that "We don't know how this cocaine metabolite (BE) got in our urine" and mere speculation about the possibility of tampering enough to put chain of custody "in issue?" If not, retests to show possible sample tampering would not be "necessary" under R.C.M. 703(f)(1). *See United States v. Hargrove*, 33 M.J. 515 (A.F.C.M.R. 1991).

Even under R.C.M. 703 analysis, the military judge erred by, in essence, equating relevance with necessity.

4. R.C.M. 703(f) is entitled "Right to Evidence". Subsections thereunder describe procedures for producing "Evidence under the control of the Government" and "Evidence not under the control of the Government." *See* R.C.M. 703(f)(4)(A) and (B).

An accused does not dictate what evidence the government will bring into court against him. Instead, the government decides when it feels the evidence is sufficient, seeks its admission in court, and argues that the evidence produced proves the accused's guilt beyond a reasonable doubt. Either before or after the presentation of his own evidence, an accused may, through a motion for a finding of not guilty, seek a judicial determination that the government's evidence is inadequate. R.C.M. 917. If this is unsuccessful, an accused has the opportunity to attack the government's evidence, either its accuracy or adequacy, or both, and to argue to the factfinder that the evidence is insufficient to justify a finding of guilt beyond a reasonable doubt. Accordingly, it is not appropriate to view the accused's motions in this case as requests that the government produce evidence, or to test them against the standard applicable to existing evidence. Instead, it is important to view the accused's motions for what they are: requests that the government fund investigative assistance designed to develop defense evidence. *See, e.g., Moore v. Kemp,* 809 F.2d 702 (11th Cir.1987) (indigent defendant sought expert assistance to, among other things, possibly conduct "different and more conclusive tests" on evidence gathered by police at the crime scene). As such, they are subject to different criteria than those set forth in R.C.M.703(f)(1).

"[A]s a matter of military due process, servicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense, without regard to indigency." *United States v. Garries,* 22 M.J. 288, 290 (C.M.A.1986). To obtain such assistance, however, the defense must demonstrate the services are necessary for adequate representation of the accused. *Garries,* 22 M.J. at 291; *United States v. Tornowski,* 29 M.J. 578, 579 (A.F.C.M.R.1989).[5] The real question

becomes, then, whether these accused are entitled, as a matter of military due process, to have the government arrange to have further testing performed on the urine specimens that have already tested positive for BE. Put another way, are we prepared to say under the facts of this case, that *without requiring the government to perform or contract for further testing of the specimens,* these accused are denied a fair trial as a matter of law? We are not.

The Chief Judge's dissent and the trial judge's apparent rationale hold a certain allure: The government has the samples, the accused are "indigent," the requested tests are relatively inexpensive, and they *might* produce a defense—why not run the tests? A simple cost/benefit analysis might dictate granting a request for a low cost test that could turn up some more information. The question here, however, is not whether the possible benefits of further tests outweigh their low costs, but whether these tests are, as a matter of military due process, required for a fair trial.

We must not lose sight of what the defense request seeks to produce. There is only one thing that the requested tests (for EME and raw cocaine) could possibly disclose favorable to the defense: tampering.[6] The tests will *not* reveal the accidental spillage of "positive" urine into an otherwise "negative" sample, or the intentional contamination of one sample with another. Neither will these tests uncover the inadvertent mislabeling of urine samples, nor the intentional substitution of one sample for another. They will not show whether an accused's food or drink was "spiked" with cocaine before consumption. The *only* utility these tests hold for the defense is to determine whether raw cocaine has found its way into an accused's urine specimen. Inasmuch as we are not aware of any reason raw cocaine would be regularly

5. We observe that the defense always has the option of retesting an accused's sample independently and offering those results found relevant, helpful and probative to the trier of fact. *See United States v. Gipson,* 24 M.J. 246 (C.M.A. 1987).

6. Although the experts testified that the tests, depending upon the results, might also enable them to render a more detailed opinion as to time and amount of use, these side benefits were clearly not the basis on which the defense grounded their request.

present near urine samples at any time throughout the collection and testing process, we must assume that inadvertent contamination is also not at issue here. Thus, the true target of these tests is limited to situations in which some person has the motive, and the opportunity, to intentionally sprinkle raw cocaine into the urine sample of an accused.

■ In the relative scheme of things, any and all of the possibilities cited above as *not* assisted by these tests are logically as likely as, or more likely than, intentional tampering by means of raw cocaine. Is our system of justice to be ground to a halt in the face of such remote contingencies? No. We apply the concept of "chain of custody" specifically to protect against such possibilities and to prevent having our justice system paralyzed by uncertainty as to the integrity of fungible evidentiary items. The government carries a burden of demonstrating, through proof of an adequate chain of custody, that the fungible evidence has been preserved in an unaltered state. *United States v. Courts,* 9 M.J. 285 (C.M.A.1980). This burden, once met, provides adequate due process to the persons whose urine samples must pass through a number of hands during the testing process.[7]

The chain of custody documentation in each of the cases at issue here is unblemished; there is no indication whatsoever of any irregularity. Nor is there the slightest hint that anyone in either chain of custody had the motive or opportunity to adulterate these accuseds' specimens—the *only* thing

the requested tests might disclose favorable to the defense. In this context, these accuseds' claims of innocence, accompanied only by a hypothetical possibility of tampering, are insufficient to justify the requested assistance. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).[8] There is simply no showing that additional testing is necessary for the adequate representation of either accused. Under these circumstances, we are constrained to find that the military judge abused his discretion when he ordered the requested tests based upon a determination that they were "necessary" under R.C.M. 703(f)(1).

Accordingly, we find that the military judge erred as a matter of law; the proceedings should not have been abated. The government's appeal is granted, and the record of trial is returned to the military judge for further proceedings. R.C.M. 908(c)(3).

Senior Judge PRATT concurs.

DIXON, Chief Judge (dissenting):

I would deny the government's appeal. On appeal, we should reverse a military judge's ruling on the production of evidence only if the ruling is clearly erroneous. That is the standard for a review of findings of fact.[1] In my view, the question as to whether any particular evidence is necessary for an adequate defense rests upon a factual determination. In this case, I not only find his decision far short of being clearly erroneous, I find it to be

---

7. In criminal cases involving scientific tests, the rights of an accused are adequately protected when there is a chance to attack the reliability of the test procedure and to cross-examine testing personnel. *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Frost,* 19 M.J. 509 (A.F.C.M.R. 1984).

If, as the Chief Judge suggests, due process requires that the possibility of tampering be definitively eliminated by the use of all available scientific methodology, would it not also require that the other possibilities cited above be similarly eliminated? Must the government, for instance, routinely perform DNA testing on its urine samples if such testing would scientifically eliminate the possibility that urine spe-

cimens were inadvertently or intentionally switched?

8. As the Eleventh Circuit Court of Appeals explained in *Moore v. Kemp:*

*Ake* and *Caldwell,* taken together, hold that a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; [footnote omitted] due process does not require the government automatically to provide indigent defendants with expert assistance upon demand.

809 F.2d at 712.

1. *United States v. Burris,* 21 M.J. 140 (C.M.A. 1985).

correct. In reviewing the findings of fact made by the military judge, I find his explanation of the necessity for the additional tests clear and convincing. He ordered the tests based on the following rationale:

(1) The defense in both cases is, essentially, "I never used cocaine, and I don't know how this cocaine metabolite (BE) got in my urine sample."

(2) Testing for BE, EME, and cocaine is a relatively simple procedure.

(3) The accused were financially unable to pay for the testing.

(4) The tests under the right circumstances could show whether the cocaine in the urine was ingested by the accused or was placed in the urine from an outside source.

The military judge was obviously concerned about the limited means available to an accused in urinalysis cases to contest guilt. He was no doubt troubled, in these cases, by the expert testimony which explained that a positive reading for the metabolite BE does not conclusively show that cocaine was ingested by the person providing the sample. *United States v. Mack*, 33 M.J. 251 (C.M.A.1991). Yet the government was contending that the additional tests were not necessary since the urinalysis results and the uncontested chain of custody were alone sufficient to support a conviction. *United States v. Harper*, 22 M.J. 157 (C.M.A.1986).

The military judge was correct in concluding that the evidence which the defense was requesting was both relevant and necessary. R.C.M. 703(a) provides that "the prosecution and defense shall have equal opportunity to obtain witnesses and evidence." In my view, the majority opinion overlooks the military judge's responsibility in determining what evidence the court should have before it. R.C.M. 801(c). There can be little dispute that if the evidence produced by the retesting is as the defense hopes, it would completely undermine the government's case.[2] As a matter

of fundamental due process, an indigent accused must be provided "the basic tools of an adequate defense." *United States v. Van Horn*, 26 M.J. 434 (C.M.A.1988).

A search for truth lies at the heart of our criminal justice system. When not inconsistent with the rules of evidence, judicial economy or other compelling reason, the interests of justice weigh in favor of insuring that factfinders have access to all available evidence in their search for truth. The military judge is in the best position to determine the need to have this evidence before the court. The military judge here not only heard the expert testimony but is also, depending upon the forum chosen by the defense, potentially the factfinder.

I am unable to find what standard the majority uses in determining when requests of this nature are necessary. It's clear they conclude that the information sought is not necessary in order for the government to present a prima facie case. But it's not clear why, as a matter of law, it is error for the judge to require the government to perform the retests. They seem to say that the defense has other means of ensuring an adequate defense, for example, by attacking the reliability of the test procedure and by cross-examination of testing personnel. However, these means would not necessarily reveal the one thing that these accused are hanging their hats on, namely, that somehow their samples were tampered with.

The majority opinion suggests several things that the retests would not show and concludes that the only possible benefit to be gained by the defense from the requests would happen only if raw cocaine had somehow found its way into the urine samples. However, the experts who testified at the Article 39(a) session pointed out that the additional tests would disclose additional information about when, how, and how much cocaine entered the urine. The following colloquy took place during the questioning of Dr. Donald Lee Frederick, Chief

---

**2.** If the results of the retests were positive for cocaine, negative for the metabolite EME and positive for the metabolite BE, expert witnesses would conclude that the person who provided the sample had not used cocaine. The logical conclusion would be that the sample had been contaminated by an outside source.

of Quality Assurance, Air Force Drug Testing Laboratory:

Q. And do you also agree with Dr. Vasiliades that if you perform the EME test and the test for cocaine that the results of those tests would tell you a lot more things than just the BE test? For instance, would it narrow the window of when the cocaine was used and how much was used?

A. Yes. They may narrow the window. They may not answer the questions specifically and most likely would not because of the variability between individuals and sets of circumstances. They would give you more information than you have with the result of one test.

When an accused is saying "I never used cocaine, and I don't know how this cocaine metabolite (BE) got in my urine sample," the information provided by the retests would be essential for the preparation of a defense. The tests would definitely establish whether the sample had been "spiked" with raw cocaine and whether or not the cocaine had passed through the body. They may also allow the experts to testify concerning the amount of cocaine consumed and when the cocaine was used in relation to when the sample was provided. Certainly, if unknowing ingestion is a defense, this information would be exceedingly useful. It is information that the finders of fact should have and there is no other way for an innocent, indigent accused to obtain this data.

Analogizing these requests to requests for investigative or expert assistance, the majority opinion concludes that the defense must demonstrate that the retests are necessary for an adequate defense. I find the majority's analogy particularly troubling since these are urinalysis cases. The ability of an accused to prepare a defense in urinalysis cases is uniquely different than in other criminal cases. The evidence can be taken from the accused's body without the requirement of a probable cause search. The chain of custody is maintained by personnel who are not trained in law enforcement. The evidence is solely scientific. The results of the testing are normally unavailable for several weeks after the sample is provided. All of these factors weigh in favor of requiring the government to provide an accused who professes innocence with the information needed to prepare a reasonable defense.

Presumably, the majority would require the defense to first attack the chain of custody in order to show any necessity for the retests. They note the chain of custody documentation is unblemished in these cases. I do not see the fairness in forcing an accused to attack the chain of custody when the test relied upon by the government is itself insufficient to scientifically show that the drug was ingested.

Accordingly, I disagree with the legal gymnastics engaged in by the majority opinion in concluding the military judge erred as a matter of law. The majority criticizes the trial judge's analysis of R.C.M. 703(f)(1), which indicates relevant evidence is necessary "when it would contribute to a party's presentation of the case in some positive way on a *matter in issue.*" They suggest his analysis is flawed because chain of custody was never put "in issue." I submit the military judge correctly sees the "matter in issue" in these cases as whether the accused used cocaine and not whether the chain of custody is proper. His decision to compel evidence which might contribute to the resolution of the issue of whether cocaine was consumed should not be overturned.

Finally, I dissent from the majority's conclusion that the military judge erred by not treating the defense requests as ones for the government's investigative assistance rather than as requests for additional evidence. This distinction lacks any legal significance. In either case, the judge's decision will rest on a finding of facts of the necessity for the requests. Moreover, I do not agree that these requests seek governmental assistance in "finding" a defense. The accused are not seeking to find a defense but rather seek evidence which would be consistent with their denials of cocaine

use. Based on the expert testimony given at the Article 39(a) session, the probability that the test results will match the hopes of the accused appear somewhat remote. Nevertheless, regardless of the outcome, the results would be relevant and admissible. As a matter of due process to insure a fair trial, I would uphold the military judge's decision ordering the retests.[3]

3. I further think this case shows why the dissent in *United States v. True,* 28 M.J. 1 (C.M.A.1989) is the better view. To permit the government to appeal rulings by the military judge which do not terminate the proceedings significantly diminishes the authority of the military judge. It's significant to note that Congress specifically authorized an appeal from a ruling which excludes evidence, yet we are now faced with an appeal from a ruling that seeks additional evidence. The ruling did not terminate the proceedings; rather, it was the government's refusal to comply with the order to produce additional evidence which forced the abatement. I find it difficult to imagine that Congress intended appellate courts to become involved with this circumstance.