UNITED STATES, Appellee,

v.

Miguel A. THOMPSON, Sergeant
U.S. Army, Appellant.

No. 66,395.
CM 8903353.

U.S. Court of Military Appeals.

Argued Dec. 5, 1991.

Decided June 22, 1992.

For Appellant: *Captain Michael Huber*
(argued); *Captain Timothy P. Riley* (on
brief); *Colonel Robert B. Kirby, Lieuten-
ant Colonel James H. Weise,* and *Captain
Alan M. Boyd.*

For Appellee: *Captain Timothy W. Lu-
cas* (argued); *Colonel Dayton M. Cramer*
and *Lieutenant Colonel Daniel J.
Dell 'Orto* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

During October and November 1989, ap-
pellant was tried by a special court-martial
composed of officer members at the Presi-
dio, San Francisco, California. Contrary to
his pleas, he was found guilty of a single
specification of wrongfully using cocaine,
in violation of Article 112a, Uniform Code
of Military Justice, 10 USC § 912a. He
was sentenced to a bad-conduct discharge.
The convening authority approved the sen-
tence on March 1, 1990, and the Court of
Military Review affirmed in an unpublished
opinion dated January 5, 1991.

This Court, on June 12, 1991, granted
two issues raised by appellant for review.
They were:

I

WHETHER THE MERE PRESENCE
OF BZE IN APPELLANT'S URINE
SAMPLE IS SUFFICIENT AS A MAT-
TER OF LAW TO CONVICT APPEL-
LANT OF WRONGFUL USE OF CO-
CAINE WHERE THE EXPERTS
AGREED THAT THE PRESENCE OF
BZE IN APPELLANT'S URINE WAS
CAPABLE OF TWO INTERPRETA-
TIONS, ONE CONSISTENT WITH
GUILT AND ONE NOT. *SEE UNITED
STATES V. CHODARA,* 29 MJ 943
(ACMR 1990) (WHERE GOVERNMENT

EXPERT'S TESTIMONY CONCERNING THE PRESENCE OF BZE IN THE ACCUSED'S URINE SUPPORTED TWO EQUALLY PERMISSIBLE INFERENCES, ONE SUPPORTING SUBJECT MATTER JURISDICTION AND ONE NOT, THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH SUBJECT MATTER JURISDICTION BEYOND A REASONABLE DOUBT).

II

WHETHER, IN LIGHT OF THE TESTIMONY OF THE TWO EXPERT WITNESSES, THE MILITARY JUDGE ERRED BY GIVING THE STANDARD INSTRUCTION TO THE MEMBERS, OVER DEFENSE OBJECTION, THAT A URINALYSIS TEST DISCLOSED THE PRESENCE OF A METABOLITE OF COCAINE IN APPELLANT'S URINE AND IF THE MEMBERS FOUND APPELLANT INGESTED COCAINE THEY COULD INFER THAT IT WAS WRONGFUL.

We hold that the evidence of record was sufficient to support a finding of guilty of cocaine use and that the members of appellant's court-martial were properly instructed in reaching this finding. *See United States v. Boulden*, 29 MJ 44 (CMA 1989). *Cf. United States v. Mack*, 33 MJ 251 (CMA 1991); *see generally California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

The prosecution's case against appellant was largely based on laboratory tests of a sample of his urine. Witnesses were called who testified to the circumstances surrounding acquisition of this sample by the Government, its custody, and laboratory testing. Evidence was also admitted showing that his urine sample tested positive for benzoylecgonine (BZE) and that the presence of this chemical compound indicated cocaine use. Both the government[1] and the defense[2] chemical experts also testified that benzoylecgonine could be produced outside the body by mixing cocaine and urine under certain circumstances. Two government experts in this case testified that this was not a real possibility in appellant's case because an expected residue of raw cocaine was not found in the sample. The defense expert could not discount the possibility of tampering with raw cocaine based on the limited nature of testing reports before him.

Prior to instructions on findings, the following exchange occurred in the record of trial:

Any other instructions requested by counsel?

TC: Yes, sir, just the standard instruction that the presence of a metabolite of cocaine raises an inference of wrongfulness.

MJ: Yes, that's standard—now standard.

\*     \*     \*     \*     \*     \*

DC: Sir, could I see that standard instruction relating to the metabolite?

MJ: Sure.

DC: Sir, we—one of the basic issues in this case is whether or not they've tested for a metabolite of cocaine, and defense would take issue that the

---

1. The government expert, Doctor David J. Kuntz, an employee of Northwest Toxicology Laboratories in Salt Lake City, Utah, where appellant's sample was tested, testified in this case as follows:

    A metabolite is the end product of a compound. As it goes through the body the liver, the acid in the stomach all tend to modify a compound to eliminate it from the body and this is—anything that changes a compound is generally referred to as a metabolite.

    On cross-examination, he further testified that benzoylecgonine was "referred to" as "a metabolite of cocaine." He explained:

    It would not be in a biological term, a metabolite if it occurred outside the body. It would loosely be termed a metabolite if it occurred within the body because that would be the body's way of eliminating that product.

2. The defense expert, Doctor William W. Manders, Laboratory Director for ToxiChem Laboratories in Wheaton, Maryland, testified somewhat more forcefully on this question. *See* Appendix.

government has shown the presence of a metabolite in the accused's urine. A metabolite is only inferred where cocaine passes through the soldier's body and here we're arguing that there's two ways that the benzoylecgonine could have got in the urine sample, either passed through the body or was directly caused by cocaine in the urine.

MJ: So?

DC: So, that is taking sides with our whole dispute. We are arguing metabolite is related to enzymic reaction....

MJ: Well, now wait a minute, Counsel. The instruction specifically says he has to use it. Obviously, if someone else contaminated it, he hasn't used it, and of course, if he hasn't used it and someone contaminated it, there would have been—there may have been a metabolite of cocaine. There may not have been, but it's up to the court to determine whether he used it or not. Now, you have a defense of "I didn't use it," and you certainly can argue that, but it doesn't affect the instruction. Now, if you have some specific instruction that you want me to give, you'll have to write it out.

DC: Yes, sir, it would just be....

MJ: This is the standard instruction and if you want to caveat somewhere or something else, you better give it to me.

DC: Yes, sir. The caveat is instead of metabolite, use the term benzoylecgonine. Just that substitution would clarify our argument.

MJ: Well, there's a dispute as to whether it's a metabolite or not and I'm certainly not in the position to solve that and say that these experts are right and those are wrong. I'm giving the particular instruction here, because as far as I'm concerned, there's sufficient expertise in the field to conclude that metabolites of cocaine exist. Now, you may not agree with that. If you want to argue something else,

you're certainly free to argue it, but I don't think it affects my instruction.

DC: I guess my only argument, sir, is that you can remove the issue by just saying benzoylecgonine, and it doesn't in any way affect the instruction, that there's no damage done to the instruction, so a substitution could be made without any damage at all to the instruction.

MJ: I'm not sure that it's awfully relevant—matter what you call it—metabolite of cocaine is benzoylecgonine.

TC: Could you simply insert metabolite or by-product of cocaine?

DC: I think the case established benzoylecgonine, there's no dispute of that, and there's no adverse effect, by using benzoylecgonine instead of the term metabolite, so it's an innocuous word that is—better word to use than the term metabolite.

TC: I'm confused.

MJ: Well, I can't pronounce it.

TC: Well, I'm not sure what he's asking.

DC: I'm asking for the substitution of benzoylecgonine in place of the term metabolite, because it doesn't take sides. If you just state what is claimed to be present in the urine, then it just removes the issue and it's an innocuous word and it doesn't hurt the instruction in any way.

MJ: I hear what you're saying but I'm not going to give it.

DC: Okay, sir.

MJ: If you want something else added, you can write it out for me.

The military judge then instructed the members as follows:

The first element is that at an unknown location between 27 May 1989 and 30 May 1989, the accused used cocaine.

The second element is that the use by the accused was wrongful.

Now use, as described in the first element, must be knowing and conscious. Use is knowing and conscious when the accused is aware of the presence of the substance at the time of its use. Unless

you are satisfied beyond a reasonable doubt that the accused was aware that he was using a controlled substance, you may not find him guilty.

*Now, there is evidence in this case that a urinalysis test disclosed the presence of a metabolite of cocaine in the accused's urine. If you find from the evidence, beyond a reasonable doubt, that the accused did in fact ingest cocaine, you can infer that the accused's use was knowing and conscious* [;] however, you are not required to draw this inference. As noted in the second element, use of a controlled substance must be wrongful. Use is wrongful if there is no legal justification or authorization for it. Use of a controlled substance may be inferred to be wrongful in the absence of evidence to the contrary[;] however, you are not required to draw this inference. Now, there is no lesser included offense to this offense of wrongful use of cocaine. Is there any court member that desires that I repeat that instruction?

(Emphasis added.)

## I

■ The first question which we must address in this case is whether the evidence of record is legally sufficient to show appellant used drugs. *See generally United States v. Ford,* 23 MJ 331 (CMA 1987); *United States v. Murphy,* 23 MJ 310 (CMA 1987); *United States v. Harper,* 22 MJ 157 (CMA 1986). In particular, appellant claims that the prosecution did not introduce sufficient circumstantial evidence of a scientific nature to show that he *ingested* cocaine. *See generally United States v. Boulden,* 29 MJ 44 (CMA 1989); *cf. United States v. Hunt,* 33 MJ 345 (CMA 1991). Instead, he argues that the evidence of record established an equal possibility that cocaine was *added* to his urine after it was taken from his body. *See United States v. Mack,* 33 MJ 251 (CMA 1991).

Our starting point in resolving this claim is *United States v. Harper, supra.* There, this Court held that urinalysis evidence properly explained by a scientific expert

"both logically and demonstratively supported findings of [marijuana] use." *Id.,* 22 MJ at 162 (footnote omitted). There we said:

In the present case the prosecution evidenced the fact that urine samples had been taken from appellant at the end of each of the charged periods. It also evidenced the fact that each sample tested positive for the presence of the metabolite delta–9–THC–9–carboxylic acid. *The prosecution then offered expert testimony that this metabolite was not naturally produced by the body. It further evidenced through expert testimony that this metabolite was produced only by the body's reaction or chemical breakdown of tetrahydrocannabinol (THC), the psychoactive or intoxicating ingredient in marihuana. See generally* Comments, *Admissibility of Biochemical Urinalysis Testing Results for the Purpose of Detecting Marihuana Use,* 20 Wake Forest L.Rev. 391 (1984).

*Id.* at 161 (emphasis added).

Appellant seizes upon the above decisional language and notes that both the government and defense experts in his case testified that benzoylecgonine was not a true metabolite of cocaine. Instead, he asserts that they testified that the presence of benzoylecgonine could have occurred as a result of adding raw cocaine to his urine sample. Accordingly, he argues that a positive test result of his urine for benzoylecgonine did not show cocaine use as required by *United States v. Harper, supra.*

■ A similar issue was addressed in *United States v. Ford, supra.* There, an accused introduced evidence "that a breakdown at the laboratory may have accounted for erroneous test results." 23 MJ at 335. We said:

*This defense evidence* challenges the basis in fact upon which the inference of wrongfulness is predicated. *See para.* 138a, [Manual for Courts–Martial, United States,] 1951 and [Manual for Courts–Martial, United States, 1969 (Revised edition) ]. *It was offered by the defense to create reasonable doubt in the factfinders' minds concerning the prosecutions'*

*circumstantial proof of use.* A conflict in evidence concerning the existence of the predicate fact, however, does not bar use of the inference. It simply means that the members must resolve this question before they decide whether the inference should be drawn in the present case. *Id.* Accordingly, the inference of wrongfulness did not disappear in this case because of this defense evidence, and of insufficiency of proof of this element existed on this basis.

*Id.* at 335–36 (emphasis added; footnote omitted). Thus, evidence consistent with the possibility of tampering with a person's urine sample does not *per se* preclude a circumstantial finding of drug ingestion.

Appellant's case substantially differs from the situation recently confronted by this Court in *United States v. Mack, supra.* In that case, the accused's urine sample tested positive for benzoylecgonine. However, a second test to ascertain the presence of ecgoninemethylester (EME), the so-called "true" cocaine metabolite, was actually conducted by the Government and the results were negative. Thus, the prosecution's own evidence in that case was in conflict, and a case-specific explanation for this conflict also was not provided by the prosecution.

Here, the more precise test was not performed by the Government, and only the mere possibility of exculpation existed. *See California v. Trombetta,* 467 U.S. at 488–89, 104 S.Ct. at 2533–34. Moreover, the Government also offered particular expert evidence based on its test results which discounted the possibility of actual tampering with appellant's urine sample. As noted above, this type of evidence was not proffered by the prosecution in *United States v. Mack, supra* 33 MJ at 255 n. 2. Accordingly, we hold that a sufficient basis to convict existed in this case. *See United States v. Ford, supra; cf. United States v. Hunt,* 33 MJ 345, 347–48 (CMA 1991).

II

█ The second issue in this case questions the propriety of the military judge's instructions on use of urinalysis test results to show wrongful cocaine use. In light of both the government and defense experts' testimony, appellant argues that the military judge incorrectly referred to benzoylecgonine as a metabolite of cocaine. Consequently, he contends that the members should not have been told that either drug use or wrongful drug use could be inferred from the presence of benzoylecgonine in his urine.

We note that all the experts clearly testified that the presence of benzoylecgonine in urine may show the ingestion of cocaine by the person who provided the urine. Moreover, the limited circumstances in which positive test results for this chemical compound could be produced by tampering with the urine sample itself were also explained to the members. Accordingly, regardless of benzoylecgonine's proper characterization as a metabolite or a compound, the probative value of its presence in urine was not overstated to the members. Thus, assuming scientific error in the judge's particular metabolite comment, it was not so significant that reversal of appellant's conviction is required. *See United States v. Boulden, supra.*

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, CRAWFORD, and GIERKE, and Senior Judge EVERETT concur. Judge WISS did not participate.

APPENDIX

Q. Doctor Manders, can you state what this Defense Exhibit G for identification is, and what it—summarize it.

A. Well, this is an article that came out of the Journal of Chromatography in 1981. *It's an Article by Fletcher and Hancock and the important factor of it—as it reads in the first paragraph, is that benzoylecgonine is considered to be the major metabolite of cocaine and man.* Many methods have been reported for detection and measurement in urine and some workers have reported detection in blood. *Others,*

*however, suggest that benzoylecgonine may not be a true metabolite of cocaine, in the sense that it is produced by nonenzymatic hydrolysis.* Now, if you're talking to a biochemist—my background is biochemistry. In order for something to be a metabolite, it must react or join with some enzyme. The enzyme has to be the compound that metabolizes. In other words, it takes the compound, breaks it down. When there is no enzyme, and no one can find an enzyme and it's spontaneous hydrolysis, then it doesn't really become a metabolite. True, my associates call it metabolite, but if you ask my associates to define metabolite, they'd have a difficult job of doing it, because they wouldn't be able to find the enzyme that caused cocaine to go to benzoylecgonine, *and all though it's published and has been published and has been accepted—I'm not saying that they are incorrect, but within time, we will move away from calling benzoylecgonine a metabolite.* [B]ut the article acknowledges many other individuals who are aware of the studies and are aware of the benzoylecgonine conversion to cocaine and its not actually being a true metabolite, and I would say the samething. It's not a true metabolite. But, if somebody wants to say, you're not calling it a metabolite, I would say well, yes. *Essentially, I am not calling it a metabolite because it does not meet the criteria of my expertise, of being a metabolite.*

(Emphasis added.)