UNITED STATES

v.

**Captain Antony W. PHILLIPS,
United States Air Force.**

**ACM 33730.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 17 Dec. 1998.

Decided 16 Aug. 2000.

Appellate Counsel for Appellant: Charles W. Gittins (argued), Colonel Jeanne M. Rueth, Lieutenant Colonel James R. Wise, and Captain Patience E. Schermer.

Appellate Counsel for the United States: Major Harold M. Vaught (argued), Colonel Anthony P. Dattilo, and Lieutenant Colonel Ronald A. Rodgers.

Before YOUNG, Chief Judge, SCHLEGEL, and BURD, Appellate Military Judges.

## OPINION OF THE COURT

BURD, Judge:

On 8–17 December 1998, the appellant was tried by general court-martial composed of members at Davis–Monthan Air Force Base (AFB), Arizona. Contrary to his pleas, he was found guilty of one specification of wrongfully using cocaine, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. He was found not guilty of three other allegations: signing a false official document, wrongfully using cocaine on divers occasions, and stealing military property of a value in excess of $100.00. The appellant was sentenced to a dismissal, confinement for 1 year, and forfeiture of all pay and allowances. The approved sentence was a dismissal, confinement for 8 months, and forfeiture of all pay and allowances.

The appellant asserts three errors. We find no prejudicial error and affirm the findings and sentence. We will address each issue individually after a brief summary of the facts.

### I. Facts

On Monday, 10 November 1997, the appellant, a C–130 pilot, was randomly selected to provide a urine sample for drug testing. The appellant was given notice of his selection at approximately 1030, and was ordered to provide the specimen no later than 1230 at a collection site at the Medical Annex on base. Instead of providing a sample as ordered, the appellant went to his off-base quarters. The appellant did not provide a urine sample until 1637 and only after he was located by personnel from his squadron and given a second order by his commander.

The appellant provided his sample at the hospital laboratory rather than the established collection site at the Medical Annex on base because he failed to appear during the time the collection site was operating. All steps in the process of collecting the appellant's urine sample were accomplished properly at the hospital lab with one exception: Senior Airman (SrA) Wells, the lab technician who received the sample from the appellant, did not complete a DD Form 2624, Specimen Custody Document—Drug Testing, for the appellant's sample. This documentation error was later compounded when the sample was boxed for shipment.

The sample was stored at the lab until Staff Sergeant (SSgt) Green, the base assistant drug testing program administrative manager, removed the sample from storage and boxed it with nine other samples collect-

ed during the scheduled collection hours on 10 November. SSgt Green added the required information regarding the appellant's sample on the front page of a DD Form 2624 that correctly listed the previously obtained nine samples, boxed the form with the ten samples, and mailed the box to the Air Force Drug Testing Laboratory (AFDTL) at Brooks AFB, Texas.

The addition of the appellant's sample to this form erroneously made it appear that his sample was collected along with the other nine listed samples and processed in the same chain of custody recorded on the back of the form. As a result, personnel at the AFDTL tested the appellant's sample because they were unaware of the chain of custody documentation discrepancy. Had they known that the person who originally received the sample from the appellant (SrA Wells) was not listed in the chain of custody record on the back of the DD Form 2624, they would not have tested it. *See* Air Force Instruction (AFI) 44–120, *Drug Abuse Testing Program*, Sections D and E (1 Apr. 1997).

The appellant's urine sample tested positive for cocaine. The cocaine metabolite benzoylecgonine (BE) concentration detected was 211 nanograms per milliliter (ng/ml). The Department of Defense cutoff level for this metabolite is 100 ng/ml.

At the request of the defense before trial, the appellant's urine sample was re-tested. The re-test was accomplished at the Associated Pathologists Laboratory (APL). The APL re-test result showed BE in the appellant's urine at a level of 220 ng/ml. The testing done at APL also showed the presence of the metabolite ecogninemethylester (EME), which confirmed that the cocaine metabolite in the appellant's urine sample came from cocaine ingested by the appellant into his body.*

The APL also tested a sample of the appellant's hair at the request of the defense. Although the test result was below the APL cutoff level to call the result positive, it re-

vealed the presence of cocaine and BE in the appellant's hair.

## II. Right to Cross-examine Witness and Present Evidence

■ The appellant claims he was denied his Sixth Amendment right to confront, effectively cross-examine, and present relevant evidence at his trial by the military judge's ruling excluding evidence relating to the violation of AFI 44–120 in the collection of his urine sample. We disagree.

We see no merit to the appellant's attempt to have this Court impose a more rigorous standard of review by asserting a Constitutional dimension to a simple evidentiary issue. The appellant confronted all of the prosecution witnesses. The appellant's argument is essentially that he was denied the right to confront Dr. Poupko, the prosecution's AFDTL expert, and SSgt Green because the military judge's ruling meant the witnesses could not be asked whether the appellant's urine sample would have been tested if AFDTL personnel had known of existing discrepancies with the documentation of the chain of custody.

■ A primary interest secured by the Confrontation Clause of the Sixth Amendment is the right of cross-examination. *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

In this case, the excluded evidence had no bearing on the believability of any witness or the truthfulness of their testimony. In this context, it twists the meaning of the Sixth Amendment beyond sensibility to suggest confrontation and cross-examination are implicated in the military judge's evidentiary ruling.

■ The military judge's ruling was narrow. Under Mil.R.Evid. 403, he excluded evidence that the failure to list SrA Wells, the person who actually received the urine

---

* For a simple statement of the significance of BE and EME, *see United States v. Mack,* 33 M.J. 251, 256 (C.M.A.1991) (Cox, J., dissenting).

sample from the appellant, in the documentation of the chain of custody on the back of the DD Form 2624 would have resulted in the appellant's urine sample not being tested at the AFDTL had personnel there known of the discrepancy. We agree with the military judge's assessment that the probative value of this evidence was marginal at best and substantially outweighed by the danger of confusion of the issues and potential to mislead the court members. Mil.R.Evid. 403.

The defense was not precluded from introducing evidence of the discrepancies related to the processing of the appellant's urine sample or from arguing that, because of the discrepancies, the court members should not conclude that the urine specimen tested was the appellant's. Moreover, notwithstanding the judge's ruling, the defense counsel brought out through cross-examination of SSgt Green that the AFDTL did not test samples in other cases when they learned before testing that the actual chain of custody was not correctly reflected on the DD Form 2624. In the appellant's case, the evidence established that, while there were discrepancies in the paperwork, the actual chain of custody was intact. What the defense was effectively seeking was nullification because the appellant's urine sample would not have been tested if personnel at the AFDTL had known the paperwork was in error. In short, the policy of the AFDTL whether to test samples when discrepancies exist on a DD Form 2624 was collateral to the material issue of the actual chain of custody. *See United States v. Owen*, 24 M.J. 390, 393 (C.M.A.1987).

■ The standard of review on issues of admissibility of evidence is whether the military judge clearly abused his discretion. *United States v. Johnson*, 46 M.J. 8, 10 (1997). Here, the military judge is entitled to wide discretion in applying Mil.R.Evid. 403 because he performed the required balancing and explained the grounds for his ruling. *United States v. Harris*, 46 M.J. 221, 225 (1997). We hold the military judge did not abuse his discretion in excluding the evidence at issue.

### III. Legal and Factual Sufficiency of the Evidence

■ The appellant claims the evidence is legally and factually insufficient to sustain appellant's conviction for knowing use of cocaine. We disagree.

■ There are two standards of review for questions regarding sufficiency of the evidence. The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [Court of Criminal Appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

Citing *United States v. Campbell*, 50 M.J. 154 (1999), the appellant claims the prosecution failed to prove, both legally and factually, that the appellant's use of cocaine was wrongful. The appellant argues the urinalysis test results and expert testimony do not permit the inference of wrongfulness because that evidence does not reasonably discount the possibility of unknowing ingestion and does not indicate a reasonable likelihood that the appellant at some time would have experienced the physical and psychological effects of the drug. *See Campbell*, 50 M.J. at 160. Under the *Campbell* decision, the appellant is correct that the original urinalysis test result standing alone and the expert testimony regarding that test do not provide sufficient evidence to permit the inference of wrongfulness. However, this does not end our analysis.

■ The offense of wrongful use of cocaine has two elements: that the appellant used cocaine, and that the appellant's use was wrongful. *Manual for Courts–Martial, United States (MCM)*, Part IV, ¶ 37b(2) (1995 ed.). Imbedded as an aspect of these elements is the requirement of knowledge,

i.e., knowledge of the presence of the controlled substance. *United States v. Campbell*, 50 M.J. 154, 159 (1999); *MCM*, Part IV, ¶ 37c(10).

We view *Campbell* as significant in two respects. First, it reveals the concern of the United States Court of Appeals for the Armed Forces (CAAF) that there is a danger of automatically equating a positive urinalysis test result with sufficient proof of the elements of the offense of wrongful use of a contraband substance. "[T]he prosecution cannot rely solely on the presence in the body of the drug or its constituent elements." *Campbell*, 50 M.J. at 160. "[T]he inference of wrongfulness strictly require[s] that the prosecution also establish the reliability of the testing methodology and explain the significance of the results of the test of the accused's sample." *Id.* at 160. Second, *Campbell* articulates a three-part standard for what expert testimony must show in prosecutions that rely solely on a positive urinalysis test result.

> The prosecution's expert testimony must show: (1) that the "metabolite" is "not naturally produced by the body" or any substance other than the drug in question; (2) that the cutoff level and reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have "experienced the physical and psychological effects of the drug"; and (3) that the testing methodology reliably detected the presence and reliably quantified the concentration of the drug or metabolite in the sample.

*Id.* at 160 (citations omitted).

In cases relying solely on a positive urinalysis test result, once the prosecution satisfies Campbell's three-part standard, "the prosecution is not required to disprove the possibility of unknowing ingestion in order to sustain the legal sufficiency of a conviction." *Id.* at 160.

*Campbell* has not changed the rules of evidence or the burden of proof. In reconsideration of its original decision, the CAAF made it clear that the three-part standard was not the only avenue of proving knowing

use. "If the test results, standing alone, do not provide a rational basis for inferring knowing use, then the prosecution must produce other direct or circumstantial evidence of knowing use in order to meet its burden of proof." *United States v. Campbell*, 52 M.J. 386, 388 (2000) (opinion on reconsideration). In the appellant's case, ample evidence was presented to satisfy the burden of proof. *Compare United States v. Barnes*, 53 M.J. 624 (N.M.Ct.Crim.App.2000) (facts independent of urinalysis test result found to be insufficient to support conviction).

The appellant's defense at trial was unknowing ingestion. As a result, the trial participants fully litigated the issue of knowledge. In particular, the prosecution focused during the trial on three matters in evidence independent of the original urinalysis test result and expert testimony regarding that test. Each of these matters independently provided sufficient evidence to permit an inference of wrongfulness from the original urinalysis test result. Taken together, they established more than sufficient evidence of knowledge to meet the burden of proof.

First, it was shown that the appellant went home and failed to report during the allotted time period to provide a urine sample and only did so after receiving a second order. This is strong evidence of consciousness of guilt. Mil.R.Evid. 404(b). Additionally, while the appellant's case focused in part on his purported preoccupation with preparing over the weekend prior to his urinalysis for a "no-notice check-ride" that he received warning of, when later asked by his commander why he showed up late, the appellant said he "forgot." This transparently false statement is also relevant on consciousness of guilt. The court members were permitted to conclude from this evidence that the appellant knew his urine contained evidence of his use of cocaine, i.e., the appellant knew he illegally used cocaine. *See United States v. Borland*, 12 M.J. 855 (A.F.C.M.R.1981); Drafter's Analysis, *MCM*, A22–34. *See also United States v. Stadler*, 47 M.J. 206, 211 (1997) (citing *United States v. Hurt*, 27 C.M.R. 3, 41, 1958 WL 3505 (C.M.A.1958)); *People v. McGinnis*, 123 Cal.App.2d Supp. 945, 267 P.2d 458 (1953).

Second, while the appellant was found not guilty of Specification 2 of Charge II, which alleged use of cocaine on divers occasions, the evidence of those uses was relevant to prove knowledge of his use of cocaine for which he was found guilty and to rebut the defense claim of unknowing ingestion. Mil. R.Evid. 404(b); *United States v. Ray*, 26 M.J. 468, 471–72 (C.M.A.1988). *See also United States v. Harper*, 22 M.J. 157, 163 (C.M.A.1986). The possibility of impermissible spillover was precluded by the military judge's proper limiting instruction. *See United States v. Southworth*, 50 M.J. 74, 76–77 (1999). *See also United States v. Curtis*, 44 M.J. 106, 128–29 (1996).

Third, in rebuttal, Dr. Selavka, the prosecution's expert on forensic toxicology and hair testing, testified about the significance of the hair analysis test result from APL. This was rebuttal to testimony by Dr. Vasiliades, the defense's expert on forensic toxicology, that the defense procured hair analysis test result was negative. Dr. Selavka testified that the hair analysis test result, while it showed the presence of cocaine and BE below that lab's cutoff to call the result positive, was inconsistent with a single unknowing use of a small amount of cocaine. This evidence was also admissible to prove knowledge and rebut the claim of unknowing ingestion. *United States v. Walker*, 42 M.J. 67 (1995); Mil.R.Evid. 404(b). *See also Ray*, 26 M.J. at 471–72.

Considering the evidence in the light most favorable to the prosecution, we hold that a reasonable factfinder could have found all the essential elements of the offense for which the appellant was found guilty beyond a reasonable doubt. *Turner.* Additionally, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

IV. Error in Convening Authority's Action

The appellant claims the convening authority was without authority to execute his adjudged dismissal. The government concedes the validity of the appellant's claim. We agree. The sentence of a commissioned officer to dismissal from the service may only be

ordered executed by the Secretary concerned or the Secretary's proper designee. Article 71(b), UCMJ, 10 U.S.C. § 871(b); Rule for Courts–Martial (R.C.M.) 1113(c)(2).

V. Conclusion

We conclude the findings and sentence are correct in law and fact, the sentence is appropriate, and no error prejudicial to the substantial rights of the appellant was committed. The record of trial will be returned to the convening authority for corrective action and corresponding correction of the court-martial order. R.C.M. 1107(f)(2), 1114(b); Air Force Instruction (AFI) 51–201, *Administration of Military Justice*, ¶ 10.4.3. *See also MCM*, App. 16. The record of trial need not be returned to this Court after correction of this administrative error. The approved findings of guilty and the sentence are

AFFIRMED.

Senior Judge SCHLEGEL concurs.

YOUNG, Chief Judge (concurring):

I concur. I write only to suggest the Court of Appeals for the Armed Forces (CAAF) re-examine the three-part standard it established in *United States v. Campbell*, 50 M.J. 154, 160 (1999) (*Campbell I*), supplemented on reconsideration, 52 M.J. 386, 388 (2000) (*Campbell II*).

The appellant was charged with wrongfully using cocaine. Although some trial judges continue to instruct on the four elements listed in the *Military Judges' Benchbook*, it is clear there are only two elements to this offense:

(1) That the appellant used a controlled substance; and

(2) That his use was wrongful.

*See Campbell II*, 52 M.J. at 388 (citing *Manual for Courts–Martial, United States (MCM)*, Part IV, ¶ 37b(2) (1998 ed.)); *Campbell I*, 50 M.J. at 159. To convict an accused of this offense, the prosecution must show that the accused had knowledge he used a controlled substance. *MCM*, Part IV, ¶ 37c(10).

To prove the appellant had knowledge he was using a controlled substance, the prose-

cution relied in part upon a permissive inference established by the President: "Knowledge of the presence of the controlled substance may be inferred from the presence of the controlled substance in the accused's body or from other circumstantial evidence. This permissive inference may be legally sufficient to satisfy the government's burden of proof as to knowledge." *MCM*, Part IV, ¶ 37c(10). The President's authority to establish this inference stems from his power to prescribe "modes of proof" for courts-martial, "which shall, so far as *he considers practicable*, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with" the UCMJ. Article 36(a), UCMJ, 10 U.S.C. § 836(a) (emphasis added). *See Campbell I*, 50 M.J. at 159; *United States v. Ford*, 23 M.J. 331, 334 (C.M.A.1987); *United States v. Windham*, 36 C.M.R. 21, 23, 1965 WL 4773 (C.M.A.1965); *United States v. McCrary*, 1 C.M.R. 780, 781, 1951 WL 1796 (A.F.B.R. 1951), *aff'd*, 1 C.M.R. 1, 1951 WL 1497 (C.M.A.1951).

Like all permissive inferences, the inference of knowledge allows, but does not require "the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant." *County Court of Ulster County v. Allen*, 442 U.S. 140, 157, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

> Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard *only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference.* For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination.

*Id.* (emphasis added).

In *Campbell I*, the CAAF established minimum criteria the prosecution would have to meet before getting the benefit of the inference. It held that no rational factfinder could make the connection between proof of the existence of the controlled substance in an accused's body and the fact that the accused knowingly used the controlled substance, unless the prosecution established, through expert testimony,

> (1) that the "metabolite" is "not naturally produced by the body" or any substance other than the drug in question; (2) that the cutoff level and reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have "experienced the physical and psychological effects of the drug"; and (3) that the testing methodology reliably detected the presence and reliably quantified the concentration of the drug or metabolite in the sample.

*Campbell I*, 50 M.J. at 160 (citations omitted).

Writing for the majority in *Campbell I*, Judge Effron claimed that this standard does not establish new law. He claims the standard follows the CAAF's precedent in *United States v. Harper*, 22 M.J. 157 (C.M.A.1986). *Campbell I*, 50 M.J. at 161 n. 2. If *Campbell* does not establish new law, I would be forced to conclude that the many trial and appellate defense counsel who practiced before me were incompetent—for none of them ever raised this issue. But, they were not incompetent, for no case prior to *Campbell I*, including *Harper*, required the prosecution to establish the reasonable likelihood that the accused experienced the physical and psychological effects of the drug. *See United States v. Bond*, 46 M.J. 86 (1997); *United States v. Pabon*, 42 M.J. 404 (1995), *cert. denied*, 516 U.S. 1075, 116 S.Ct. 780, 133 L.Ed.2d 731 (1996); *United States v. Thompson*, 34 M.J. 287 (C.M.A.1992); *United States v. Boulden*, 29 M.J. 44 (C.M.A.1989); *United States v. Ford*, 23 M.J. 331 (C.M.A.1987). Judge Effron is correct in asserting that none of these post-*Harper* cases dealt directly with the second part of the three-part standard. *Campbell I*, 50 M.J. at 161 n. 2. But, they did concern the legal sufficiency of the evidence, which the court upheld in each instance. If

the CAAF accepts an assignment of error concerning the legal sufficiency of the evidence, it is difficult to see how the Court could overlook a basic requirement for legal sufficiency.

Regardless of whether the three-part standard is new or old, I believe it unduly burdens the use of the President's inference. The first part of the *Campbell* standard requires the expert to testify that neither the drug nor the metabolite is naturally produced by the body or any substance other than the drug in question. Clearly, no conviction based on a drug test could be found legally sufficient if there is no way to determine whether the controlled substance was produced naturally by the body or from some other lawful substance. But, why does an expert need to testify about this issue? Surely, for most drugs of abuse, the scientific evidence is clear—these are adjudicative facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Mil. R.Evid. 201(b)(2). A military judge "shall take judicial notice" of such facts *if the prosecution provides him the necessary treatises or other information establishing the facts.* Mil.R.Evid. 201(d). *See United States v. Pond,* 36 M.J. 1050 (A.F.C.M.R.1993) (appellate court took judicial notice that methamphetamine use can be detected for 24 to 48 hours following ingestion); *United States v. Brown,* 33 M.J. 706 (A.C.M.R.1991) (holding military judge could appropriately take judicial notice concerning cocaine, its metabolic process, and urinalysis testing methodology); *Hines v. Secretary of Department of Health & Human Servs.,* 940 F.2d 1518 (Fed.Cir. 1991) (finding the incubation period of measles is a well-known medical fact capable of ready and accurate determination such as to permit judicial notice to be taken).

The second part of the standard is more troublesome and contains two sub-parts: The prosecution must demonstrate through the expert that the cutoff level on the test and the reported concentration of the metabolite or drug in the accused's specimen are high enough (a) to reasonably discount the possibility of unknowing ingestion, and (b) to indicate a reasonable likelihood that the user at

some time would have experienced the effects of the drug. Although the meaning of subpart (a) is not clear, it appears the CAAF meant that the test results must reasonably discount the possibility of a positive caused by incidental contact with the drug—such as passive inhalation from being present in a room full of marijuana smoke or innocently touching currency used by others to snort a controlled substance. *See, e.g., Harper,* 22 M.J. at 163. If this is indeed what the CAAF meant, they should say so. The current formulation of subpart (a) suggests that the expert must testify that it is unlikely the accused did not know he was ingesting the controlled substance. No expert can so testify. By resorting to sources whose accuracy cannot reasonably be questioned, the prosecution may be able to establish that the cutoff levels for most drugs of abuse have been set to reasonably discount the possibility that incidental contact caused the positive. If the prosecution does so, the military judge should be able to take judicial notice of such adjudicative facts. Mil.R.Evid. 201.

Subpart (b) requires the expert to testify that the cutoff level and reported concentration level indicate a reasonable likelihood that the user at some time experienced the physical and psychological effects of the drug. Judge Effron cites *Harper,* 22 M.J. at 163, and *United States v. Murphy,* 23 M.J. 310, 312 (C.M.A.1987), for this proposition. *See Campbell I,* 50 M.J. at 160. *Murphy* doesn't even discuss the issue, and no fair reading of *Harper* could find such proof a requirement.

> To persuade the court to draw this inference, expert testimony was again offered by the prosecution. Doctor Jain testified that the nanogram readings on the three samples ruled out the possibility of passive inhalation. *Moreover,* he testified that these particular results indicated that the user at sometime experienced the physical and psychological effects of the drug.

*Harper,* 22 M.J. at 163 (emphasis added).

How is subpart (b) relevant to determining whether or not an accused knew he was ingesting a controlled substance? The focus of the knowledge requirement is at the time of ingestion, not when and if the accused

experienced the drug's effects. Is it any less of a crime if the accused knowingly ingested a controlled substance, but did not experience the physical and psychological effects?

The CAAF may have based subpart (b) on an inference of its own—that individuals knowingly ingest controlled substances to experience their effects; therefore, if there is no evidence they experienced the effects, then we cannot reasonably say they knowingly ingested the controlled substances. This is just plain faulty logic. In my opinion, the prosecution's inability to establish a reasonable likelihood that the accused experienced the effects of the drug should not deprive the prosecution of the benefit of the inference or make such a conviction legally insufficient. While the inability of the prosecution to establish the reasonable likelihood that an accused felt the effects of the drug may cause a factfinder not to draw the inference, it does not make the drawing of the inference irrational. It is a matter of weight. By applying subpart (a), we have already eliminated the reasonable possibility that incidental contact caused the positive test results. That should be enough for the prosecution to get the benefit of the inference.

An examination of the facts in the Supreme Court's seminal case on inferences may be instructive. In *County Court of Ulster County v. Allen,* three adult males and a 16-year-old girl were jointly tried, *inter alia,* with possessing two loaded handguns found either on the floor of the front passenger seat or on the front passenger's seat in the automobile in which they were riding. The guns were in an open handbag. Under the applicable state statute, presence of a firearm in an automobile was presumptive evidence of its illegal possession by all persons in the vehicle, unless the firearm was found upon the person of one of the occupants. The trial judge instructed the jury that they were entitled, but not required, to infer from the presence of the guns in the vehicle that each occupant was able to exercise dominion and control over the firearms. The Second Circuit concluded that the statute was unconstitutional on its face.

The Supreme Court recognized that interpretations other than that of the statutory

inference were possible. The guns could have belonged to the 16-year-old girl in whose handbag they were found. The other occupants of the vehicle might not have been aware of the presence of the guns or may not have been able to exercise dominion and control over them. But, these possibilities did not deprive the prosecution of the benefit of the inference. Those were just factors the jury could consider in determining whether to apply the inference and whether the evidence was sufficient to prove beyond a reasonable doubt that the occupants actually did possess the guns. The Supreme Court held that under the circumstances of the case, the jury would have been reasonable in rejecting the possibilities other than of guilt. The inference was valid because there was a " 'rational connection' between the basic facts that the prosecution proved (the presence of the guns in an open handbag in the passenger compartment of the vehicle) and the ultimate fact presumed (that the occupants knew of the presence of the guns and could exercise dominion and control over them), and the latter is 'more likely than not to flow from' the former." *Id.* at 165, 99 S.Ct. 2213.

In urinalysis cases, once the prosecution establishes that the controlled substance or its metabolite is not naturally produced by the body or by some other substance, there is a rational connection between its presence in the accused's body and the "ultimate fact presumed"—that the accused knew he used the controlled substance. And, it is more likely than not that a person whose body contains such a substance knowingly ingested it. But, we have gone further. We even force the prosecution to establish that the cutoff level for the test is high enough to reasonably discount the possibility that an incidental contact caused the positive test result. The fact that there are other possible explanations for the presence of the controlled substance in the body should not negate the availability of the inference, just whether the factfinder should apply the inference and find the accused guilty beyond a reasonable doubt.

The third part of the *Campbell* standard requires the prosecution to demonstrate through the expert that the testing method-

ology reliably detected the presence and reliably quantified the concentration of the drug or metabolite in the sample. It is difficult to see why the testing methodology or its reliability should be considered in deciding whether the inference is applicable. These are questions of basic admissibility of the evidence and should be handled as such. If the prosecution cannot establish the reliability of the testing methodology and the results, then the military judge should exclude the evidence. *See* Mil.R.Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Nimmer,* 43 M.J. 252 (1995). Without the admission of the test results, the applicability of the inference is moot.

For confirming the presence of a controlled substance in urine, the Air Force Drug Testing Laboratory (AFDTL) uses the gas chromatograph/mass spectrometer (GC/MS). This is state-of-the-art technology for determining the presence of drugs in urine. The testing methodology employed by the AFDTL has been scrutinized for years and is universally accepted throughout the scientific community for its ability to reliably detect the presence and accurately quantify the concentration of drugs of abuse in a urine specimen. There is no reason why the military judge should not be able to take judicial notice of its reliability. *See, e.g., United States v. Beasley,* 102 F.3d 1440, 1448 (8th Cir.1996) (holding DNA testing by the polymerase chain reaction method was reliable under *Daubert,* and that courts could take judicial notice of its reliability in the future); *United States v. Jakobetz,* 955 F.2d 786, 800 (2d Cir.1992) (holding judicial notice could properly be taken of the general acceptability of the general theory and use of the specific techniques of DNA profiling). Of course, the reliability of test results may be challenged by showing deficiencies in the procedure followed in the particular case. *Beasley,* 102 F.3d at 1448.

Once the military judge takes judicial notice of the reliability of the testing technique, the report of the laboratory results should be admissible, without resort to expert testimony, as a record of regularly conducted activity under Mil.R.Evid. 803(6). *United States*

*v. Porter,* 12 M.J. 129 (C.M.A.1981). *See United States v. Garnett,* 122 F.3d 1016, 1018 (11th Cir.1997) (citing *United States v. Baker,* 855 F.2d 1353, 1359 (8th Cir.1988) (holding lab reports identifying drugs were admissible as business records since they were made on a routine basis)); *United States v. Roulette,* 75 F.3d 418 (8th Cir.1996) (holding laboratory reports identifying substance as cocaine base were admissible under Fed. R.Evid. 803(6) without testimony of person who conducted tests or proof of her unavailability). Such lab reports may be self-authenticating. Mil.R.Evid. 902(4a).

In *Campbell I,* the CAAF took great pains to explain their concerns with the urinalysis program. The Court noted that use of urinalysis results in court-martial proceedings "was in contrast to the Supreme Court's approach to civilian urinalysis programs"; the CAAF has gone well beyond the constitutional analysis that the Supreme Court has applied in civilian society in approving "prosecutorial use of permissive inferences in criminal proceedings to sustain convictions based solely upon the results of a drug test"; and, "[t]he possibility of a positive result from an error in the test or from unknowing ingestion of a substance that does not trigger any reaction on the part of the servicemember is the worst nightmare of every good servicemember and a cause of serious concern to the judicial system." *Campbell I,* 50 M.J. at 159–60. With all due respect, I disagree.

I readily admit that no one likes participating in the urinalysis program. It is not a pleasant experience for anyone, including appellate judges, to provide a urine specimen under direct observation. There is also some anxiety involved in the process—once servicemembers provide their specimens, they lose control of them. But, that is why the specimens are collected, shipped, and tested under chain of custody procedures and that confirmatory testing is done using state of the art technology.

Inspection testing is either constitutional or it is not. The CAAF claims it is constitutional, and I have no doubt that so would the Supreme Court. *See National Treasury*

*Employees Union v. Von Raab,* 489 U.S. 656, 671, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *United States v. Bickel,* 30 M.J. 277 (C.M.A. 1990). I find nothing unconstitutional about inspection testing or the use of the President's permissive inference to show knowledge. I believe part 2(b) of the *Campbell* three-part test is unwarranted and based on an invalid inference of its own.